[Civ. No. 13381. Second Dist., Div. One. May 28, 1942.]

A. CAMINETTI, JR., as Insurance Commissioner, etc., Respondent, v. GUARANTY UNION LIFE INSURANCE COMPANY (a Corporation), Appellant.

Robert W. Kenny, Morris E. Cohn, Sherman & Sherman, Otto Christensen and John L. Flynn for Appellant.

Earl Warren, Attorney General, and John L. Nourse, Deputy Attorney General, for Respondent.

DRAPEAU, J. pro tem.—In this case we have again to deal with an appeal from an order of the superior court approving the take-over of a mutual insurance company by the State Insurance Commissioner. Principles involved are the same as those discussed in *A. Caminetti, Jr., Insurance*

*Commissioner of the State of California* v. *State Mutual Life Insurance Company,* Civil No. 13165, *ante,* page 321 [126 P. (2d) 165], this day decided. The facts are similar, with exceptions which will be pointed out. The arguments are likewise similar, with some additional to those discussed in the *State Mutual* case, *supra.*

Guaranty Union Life Insurance Company was organized as a mutual insurance company under the Insurance Code of this state. The primary movers in this organization and the managers of the company were two brothers, who had theretofore been managers of two mutual assessment insurance companies. Upon the organization of the new company the assets and insurance business of the two companies last mentioned were transferred to it.

As the new company grew, executives and employees were added. Among these were more brothers of the two already mentioned, a sister, and brothers-in-law, until at the time of the take-over, there were engaged in the business as executives, managers and employees eight related persons. These persons were being paid by the company $6,000 per month as salaries. In the meantime, one of the first mentioned brothers passed away, and the other brother who was with him in the beginning became president of the company in his place.

The payment of this large amount of salaries to the members of a family, which dominated and controlled a mutual insurance company, was the principal reason alleged by the Insurance Commissioner for the take-over.

The company was solvent; it had grown under the family management; but the commissioner determined, and the court approved his determination, that the withdrawal from the funds of the mutual policyholders of these monthly salaries made it hazardous for it to continue in business. There is substantial evidence in the record to support this conclusion of the trial court, which requires the affirmance of the order. As compared with $72,000 per year paid to the family management of appellant corporation, an actuary called as a witness for the corporation testified that in his opinion a company of its size and character would require an executive staff of three or four persons, with a salary cost of about $24,000 a year.

Estoppel of the state to take over the company has already been discussed in the case of *State Mutual Life Insurance Company, supra.*

Further contentions presented by the appellant are disposed of as follows:

(a) That the order of the trial court is not supported by the evidence. With, the exception of that mentioned hereunder, there is no need of repeating in any detail the evidence before the trial court. As already stated, our examination of the record discloses that there was sufficient evidence to support the order dismissing appellant's application to terminate the conservatorship of the commissioner and for the return of the business.

(b) That the evidence does not support the commissioner's holding that the payment of the salaries complained of involved a hazardous condition as defined in subdivision (d) of section 1011 of the Insurance Code; said subdivision and section only means financial hazard.

█ Did the withdrawal of these funds constitute a hazardous condition as defined by the Insurance Code? To follow to its conclusion appellant's argument that there could be no hazard to policyholders so long as the business is solvent, would be to sanction the withdrawal of policyholders' money in the payment of excessive salaries without restriction. This is not the law. Excessive withdrawal of policyholders' funds continued long enough will eventually render any company insolvent, and thus destroy the very purpose of the payment of insurance premiums. The people of the state and interested policyholders have a vital interest in this. There is no requirement of our Insurance Code that the Insurance Commissioner must wait until an insurance company is insolvent before he takes action to protect the policyholders. To so hold would be to apply the ancient aphorism about locking the barn door after the horse is stolen.

Along with other meanings, the Standard Dictionary defines the noun "hazard" as exposure to the chance of loss or injury, and the adjective "hazardous" as involving risk of loss. It is in this sense that subdivision (d) of section 1011 of the Insurance Code must be read. If the management of the insurance company so conducts its business that there is loss, or risk of loss to the policyholders, it becomes the duty of the Insurance Commissioner to take possession of the company's assets and to conduct its business as conservator. This is the meaning of the word "hazardous" as used in the statute.

The Insurance Code contains ample authority for the re-

organization or rehabilitation of insurance companies taken over by the insurance commissioner, so that they may resume normal business, if that be possible. Liquidation does not necessarily need to follow conservatorship.

Withdrawal of money from a mutual insurance company as salary for services not performed, or for services overpaid, continued long enough must finally result in loss to the policyholder members and in the insolvency of the company. And, insolvent or not, such withdrawals must result in loss to the policyholders month by month as the money is taken out of the insurance company's funds.

There are additional reasons why improper withdrawal of funds becomes hazardous to an insurance company, to its members, and to the public. The management may succumb to the temptation to improperly rewrite existing policies, thus transferring to the general funds of the company built-up policy reserves belonging to individual policyholders, for the purpose of using such reserves to pay excessive salaries. Or the management may be induced to adopt an unfair and hardboiled policy in dealing with claims of beneficiaries, to the end that money for excessive and unearned salaries may be diverted from them. During the year 1939 appellant corporation rejected claims of $89,100.99, and settled these by the refund of premiums amounting to $16,431.61, or $72,669.38 less than was payable under the terms of the policies. During the same year it compromised claims of $177,370.83, paying in connection with such compromise settlements $84,081.85, or $93,288.98 less than the amount covenanted to have been paid by the policies. By the rejection and compromise of these claims, the company "saved" a total of $165,958.36 in that year. During the six-year period in which the corporation was operated by this family management no dividends were paid to the policyholders, and premiums on one group of policies were twice increased. The Insurance Commissioner could well have determined that this record alone indicated a hazard to the company and its policyholders, either by improper assumption of risks, or by unfair treatment of policyholders and claimants.

There has been some discussion in the briefs as to whether the family management of this company exercised a proprietary control over its affairs. If there was any improper proprietary control it would not only fall under another subsection of Insurance Code section 1011, but would be

evidence of hazardous condition as the term has been defined. In this connection, there are in the record two rather significant things:

One was an agreement entered into between the brothers, sisters, and brothers-in-law, requiring them to pay to certain relatives of any of them who might die a proportion of the salary paid by the company to surviving members of the family. In this agreement were recitals by way of preamble, as follows:

"This Agreement, made and entered into by and between the following named individuals: A. L. Rose, Milton Rosenthal, D. S. Kent, B. Abrams, S. G. Rose, Donald L. Rose, Paul Weller.

"Whereas, the Guaranty Union Life Insurance Company is a mutual company with no evidence of ownership available; and

"Whereas, each of the above named individuals have been responsible for the organization, growth, and development of the company; and

"Whereas, it is thought advisable to provide in some manner for the future security of the families of each of the above named individuals in the event of disability or death of any one of the above named individuals, we do each of us agree as follows, to wit:"

Secondly, the brother who was president admitted that the company paid the legal expense, including attorney's fees, involved in a proceeding in the superior court which resulted in an order changing his name from Rosenthal to Rose.

These matters, and others before the trial court, demonstrate the rather common and sometimes erroneous concept of human nature that that over which one exercises dominion and control becomes one's vested property. ■ The office of Insurance Commissioner and the code of procedure enacted into law by our legislature, denominated the Insurance Code, are designed to insure that an officer of the state will be vigilant to protect the rights of the true owners of every insurance business conducted in California, whether that business be mutual or proprietary in character.

■ (c) It then is argued that if any grounds for the takeover existed, they were removed by the voluntary action of the company. At or about the time of the take-over the board of directors made a drastic cut in salaries paid to the members of the family in control; some of the directors

resigned; other citizens of the community took their places. In passing, it may be said that the trial court could well have considered this circumstance in determining that the salaries theretofore paid were improper. However, these facts are urged in support of appellant's contention that the trial court should have found under Insurance Code section 1012 "that said person can properly resume title and possession of its property and the conduct of its business."

To this argument there is a ready and complete answer. It is that there was no change in the power to control this company by the family management of it. Before the court or the commissioner would have been warranted in turning the business of the mutual members of the company back to the family managers there must have been evident a state of mind as to them which would thereafter preclude any further raids upon the funds of the policyholders. This is a matter which, of necessity, must be confined to the discretion of the trial court, which hears the testimony, and views the witnesses, and analyzes the financial statements of the company. If the trial court, upon competent testimony and without abuse of discretion, determines that the past record of the management of a mutual company is such that that management should not again be permitted to control the destinies of the policyholders, that determination is binding upon our courts of review.

(d) It is next argued that the trial court erred in compelling appellant to assume the burden of proof upon the hearing of its application in the superior court. This involves an interesting question of procedure in cases of this kind, apparently necessary to be determined for the first time by this court. What should be the order of proof after the Insurance Commissioner has taken over an insurance company, and the matter is before the superior court? And upon whom rests the burden of proof?

The trial court required appellant to assume the burden of proof and to proceed with the presentation of testimony. When the case for the applicant was closed, a motion was granted dismissing defendant's application to have the business restored to the company.

Of course, the order of proof on any trial is a matter to some considerable extent within the discretion of the trial court. But the appellant complains that it was required not only to present its case first, but to undertake the burden of

proof incumbent upon the plaintiff in any ordinary law suit.

The trial court was correct in its ruling as to the burden of proof. It was the duty of appellant to undertake the presentation of testimony and to assume the burden of proof upon its application to the court for an order terminating the conservatorship.

■ The Insurance Commissioner of the State of California is a public officer, clothed with the power of the State. The business of insurance is one charged with a public interest. Upon consideration of whether or not the commissioner was justified in taking over an insurance company, he is entitled to the presumption that his official duty has been regularly performed. (Subd. 15, § 1963, Code of Civ. Proc.). This presumption applies to the finding of the commissioner in this case that after an examination appellant corporation was in such condition that its further transaction of business would be hazardous to its policyholders, or creditors, or to the public. (Subd. d, § 1011, Ins. Code.)

The Insurance Code provides that the order of the commissioner taking over the company shall continue in force and effect until on application either of the commissioner or of the company it shall appear to the court that the ground for the commissioner's order does not exist or has been removed and that said company can properly resume title and possession of its property and the conduct of the business. (§1012, Ins. Code.)

■ In this case the application for restoration of the company to its former managers alleged that there was no ground for the making of the commissioner's order; that the cause for the take-over, if any, was removed, and that the company could properly resume title and possession of its property and the conduct of the business. It was incumbent upon the appellant to prove the facts alleged. Therefore, the burden of proof was upon appellant.

■ (e) Finally we come to a consideration of asserted error in the trial court's rulings on the admissibility of evidence. These rulings come under three heads: (1) That the court erred in sustaining objection to admission of evidence as to the expense of other California mutual insurance companies. (2) That the court erred in sustaining objection to the admission of evidence as to the solicitation by the Insurance Commissioner of proxies for himself in this particular company; and (3) That objection was sustained to the introduc-

tion of evidence of a purported approval by a former Insurance Commissioner of the payment of attorney's fees incurred in defending officers against criminal charges. An examination of the record sustains the view which the trial court took in its rulings on each of these matters, i. e., that they, and each of them, were incompetent, irrelevant and immaterial.

The order of the superior court denying the application of appellant for an order terminating the conservatorship is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied June 19, 1942, and appellant's petition for a hearing by the Supreme Court was denied July 23, 1942.